**LOS ANGELES & S. L. R. CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).**

(District Court, S. D. California, S. D. December 7, 1925.)

1. Commerce ⊂≈89—Courts have no duty nor power to fix value of railroad property for rate-making purposes.

Court is not charged with duty, and has not power, to fix value of railroad property on which rates are authorized to be fixed by Interstate Commerce Commission, but only to suspend, enjoin, or annul action of Commission itself in proper cases.

2. Commerce ⊂≈96—Interstate Commerce Commission held to have erred in valuing railroad property at greatly less than its actual true value, and injunction against enforcement of order was warranted.

Under Interstate Commerce Act, § 19a, as added by Act March 1, 1913, and amended by Act June 7, 1922 (Comp. St. Ann. Supp. 1923, § 8591), providing for valuation by Interstate Commerce Commission of property of carriers as of June 30, 1914, and in view of section 15a, par. 4, as added by Act Feb. 28, 1920, § 422 (Comp. St. Ann. Supp. 1923, § 8583a), declaring that for "rate-making purposes" Commission shall give due consideration to all elements of value recognized by the law of the land, Commission errs when, in making valuation, it proceeds on theory that railroad property has more than one kind of value, and where from Commission's report and final valuation, made after considering new evidence introduced in suit to set aside a prior valuation and certified to it by court, as required by statute, it is obvious that it has given no effect to such evidence, but has arrived at a valuation greatly less than true actual value of property, injunction should issue against enforcement of order.

In Equity. Suit by the Los Angeles & Salt Lake Railroad Company against the United States, with the Interstate Commerce Commission and the Western Union Telegraph Company as intervening defendants, to obtain the annulment of orders of the Commission reporting the final valuation of petitioner's property under Interstate Commerce Act, § 19a, as added by Act March 1, 1913. Orders annulled, and Commission enjoined from enforcing them.

A. S. Halsted, of Los Angeles, Cal., and H. A. Scandrett and J. M. Souby, both of Omaha, Neb., for petitioner Los Angeles & S. L. Ry. Co.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., and J. E. Simpson, Asst. U. S. Atty., of Los Angeles, Cal., for the United States.

P. J. Farrell and E. M. Reidy, both of Washington, D. C., for the Interstate Commerce Commission.

Ralph H. Kimball, of Washington, D. C., for the Western Union Telegraph Co.

Before ROSS, Circuit Judge, and JAMES and McCORMICK, District Judges.

ROSS, Circuit Judge. This suit was brought in this court, at the time, as now, consisting of one Circuit Judge and two District Judges, by petition (subsequently amended), for the purpose of obtaining the annulment of an order of the Interstate Commerce Commission reporting the "final valuation" of the petitioner's property under section 19a of the Interstate Commerce Act. The defendant and intervening defendants objected to the jurisdiction of this court in the matter, which objection was disposed of by its decision, rendered March 16, 1925, and reported in 4 F.(2d) at page 736, where will be found reference to the acts of Congress conferring jurisdiction upon the court, which need not be restated here, but only such provisions of the statutes as are pertinent to the matters we have now to decide.

On the hearing before the court of the petition as amended, a large amount of evidence was introduced on the part of the petitioner, which was not submitted to or heard by the Commission, before or at the time of its report and order complained of. Congress on March 1, 1913 (37 Stat. 701 [Comp. St. § 8591]), passed an act entitled "An act to amend an act entitled 'An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, and all acts amendatory thereof," providing for a valuation of the several classes of property of carriers subject thereto, and securing information concerning their stocks, bonds, and other securities, the enacting clause of which added to the act of 1887, as amended, a new

section to be known as section 19a, and to read as follows:

"Sec. 19a. That the Commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this act. To enable the Commission to make such investigation and report, it is authorized to employ such experts and other assistants as may be necessary. The Commission may appoint examiners who shall have power to administer oaths, examine witnesses, and take testimony. The Commission shall make an inventory which shall list the property of every common carrier subject to the provisions of this act in detail, and show the value thereof as hereinafter provided, and shall classify the physical property, as nearly as practicable, in conformity with the classification of expenditures for road and equipment, as prescribed by the Interstate Commerce Commission.

"First. In such investigation said Commission shall ascertain and report in detail as to each piece of property owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any. The Commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier, and an analysis of the methods of valuation employed, and of the reasons for any differences between any such value, and each of the foregoing cost values.

"Second. Such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purposes of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same, and separately the original and present cost of condemnation and damages or of purchase in excess of such original cost or present value.

"Third. Such investigation and report shall show separately the property held for purposes other than those of a common carrier, and the original cost and present value of the same, together with an analysis of the methods of valuation employed. * * *"

The last-mentioned act also contained various provisions not pertinent to the present inquiry, and thereafter proceeded as follows:

"Every common carrier subject to the provisions of this act shall furnish to the Commission or its agents from time to time and as the Commission may require maps, profiles, contracts, reports of engineers, and any other documents, records, and papers, or copies of any or all of the same, in aid of such investigation and determination of the value of the property of said common carrier, and shall grant to all agents of the Commission free access to its right of way, its property, and its accounts, records, and memoranda whenever and wherever requested by any such duly authorized agent, and every common carrier is hereby directed and required to co-operate with and aid the Commission in the work of the valuation of its property in such further particulars and to such extent as the Commission may require and direct, and all rules and regulations made by the Commission for the purpose of administering the provisions of this section and section twenty of this act shall have the full force and effect of law. Unless otherwise ordered by the Commission, with the reasons therefor, the records and data of the Commission shall be open to the inspection and examination of the public.

"Upon the completion of the valuation herein provided for the Commission shall thereafter in like manner keep itself informed of all extensions and improvements or other changes in the condition and value of the property of all common carriers, and shall ascertain the value thereof, and shall from time to time, revise and correct its valuations, showing such revision and correction classified and as a whole and separately in each of the several states and territories and the District of Columbia, which valuations, both original and corrected, shall be tentative valuations and shall be reported to Congress at the beginning of each regular session.

"To enable the Commission to make such changes and corrections in its valuations of each class of property, every common carrier subject to the provisions of this act shall make such reports and furnish such information as the Commission may require.

"Whenever the Commission shall have completed the tentative valuation of the property of any common carrier, as herein directed, and before such valuation shall become final, the Commission shall give notice by registered letter to the said carrier, the Attorney General of the United States, the Governor of any state in which the property so valued is located, and to such additional parties as

the Commission may prescribe, stating the valuation placed upon the several classes of property of said carrier, and shall allow thirty days in which to file a protest of the same with the Commission. If no protest is filed within thirty days, said valuation shall become final as of the date thereof.

"If notice of protest is filed the Commission shall fix a time for hearing the same, and shall proceed as promptly as may be to hear and consider any matter relative and material thereto which may be presented in support of any such protest so filed as aforesaid. If after hearing any protest of such tentative valuation under the provisions of this act the Commission shall be of the opinion that its valuation should not become final, it shall make such changes as may be necessary, and shall issue an order making such corrected tentative valuation final as of the date thereof. All final valuations by the Commission and the classification thereof shall be published and shall be prima facie evidence of the value of the property in all proceedings under the act to regulate commerce as of the date of the fixing thereof, and in all judicial proceedings for the enforcement of the act approved February fourth, eighteen hundred and eighty-seven, commonly known as 'the act to regulate commerce,' and the various acts amendatory thereof, and in all judicial proceedings brought to enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission.

"If upon the trial of any action involving a final value fixed by the Commission, evidence shall be introduced regarding such value which is found by the court to be different from that offered upon the hearing before the Commission, or additional thereto and substantially affecting said value, the court, before proceeding to render judgment shall transmit a copy of such evidence to the Commission, and shall stay further proceedings in said action for such time as the court shall determine from the date of such transmission. Upon the receipt of such evidence the Commission shall consider the same and may fix a final value different from the one fixed in the first instance, and may alter, modify, amend or rescind any order which it has made involving said final value, and shall report its action thereon to said court within the time fixed by the court. If the Commission shall alter, modify, or amend its order, such altered, modified, or amended order shall take the place of the original order com-

plained of and judgment shall be rendered thereon as though made by the Commission in the first instance. If the original order shall not be rescinded or changed by the Commission, judgment shall be rendered upon such original order."

June 7, 1922 (42 Stat. pt. 1, p. 624 [Comp. St. Ann. Supp. 1923, § 8591]), Congress passed an act entitled "An act to further amend an act entitled 'An act to regulate commerce,' approved February 4, 1887, as amended," which reads as follows:

"That the paragraph entitled 'First' of section 19a of the Interstate Commerce Act, as amended, is amended by inserting after the words 'In such investigation said Commission shall ascertain and report in detail as to each piece of property' the words and commas following: 'Other than land,' so that said paragraph as amended shall read as follows:

"'First. In such investigation said Commission shall ascertain and report in detail as to each piece of property, other than land, owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any. The Commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier, and an analysis of the methods of valuation employed, and of the reasons for any differences between any such value and each of the foregoing cost values.'

"Sec. 2. That the paragraph entitled 'Second' of said section 19a is amended by striking out the comma after the words 'and the present value of the same,' and inserting a period in place thereof, and by striking out the words 'and separately the original and present cost of condemnation and damages or of purchase in excess of such original cost or present value' at the end of said paragraph, so that said paragraph as amended shall read as follows:

"'Second. Such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purpose of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same.'"

The record shows that August 2, 1919, the

Commission made a tentative valuation of the petitioner's property, under the Valuation Act, announcing certain findings respecting the cost of reproduction new and cost of reproduction less depreciation of the petitioner's property other than lands, the present value of its lands and the original cost to date of portions of its property, and certain statements as to the corporate and financial history of the petitioner and its predecessors in interest, and an analysis of and certain modifications in the investment account as carried on petitioner's books. It contained no finding as to the total value of the petitioner's property.

Subsequently, to wit, March 31, 1921, the Commission made a supplemental tentative valuation, in which it announced a finding of a single sum value of $45,871,093, and also reporting the costs of reacquiring the company's land as of date June 30, 1914. To both of such tentative valuations the petitioning company entered protests and in support of such protests introduced evidence at hearings before the Commission, at which hearings opposing evidence was also introduced. The matter was submitted to the Commission by oral arguments and also on briefs, resulting in a report and order of the Commission, made and entered June 7, 1923 (from which there were a number of dissents by various of the commissioners), fixing the "final" single sum "value for rate-making purposes" of the property of the company at $45,000,000, as of June 30, 1914—the present petitioner claiming that its property was at that date worth more than $70,000,000.

As will be seen from provisions of the Act of March 1, 1913, above set out, the statute expressly declares that if, after hearing any protest of a tentative valuation by the Commission, it shall conclude that such valuation should not become final, it shall make such changes therein as it thinks proper, and that the order fixing its final valuation shall be prima facie evidence of the value of the property in all proceedings under the act to regulate commerce as of the date of the fixing thereof, and in all judicial proceedings brought to enjoin, set aside, annul, or suspend, in whole or in part, any order of the Commission.

That statute further, in express terms, declares that "if upon the trial of any action involving a final value fixed by the Commission evidence shall be introduced regarding such value which is found by the court to be different from that offered upon the hearing before the Commission, or additional thereto and substantially affecting said value, the court, before proceeding to render judgment shall transmit a copy of such evidence to the Commission, and shall stay further proceedings in said action for such time as the court shall determine from the date of such transmission. Upon the receipt of such evidence the Commission shall consider the same and may fix a final value different from the one fixed in the first instance, and may alter, modify, amend or rescind any order which it has made involving said final value, and shall report its action thereon to said court within the time fixed by the court. If the Commission shall alter, modify, or amend its order, such altered, modified, or amended order shall take the place of the original order complained of and judgment shall be rendered thereon as though made by the Commission in the first instance. If the original order shall not be rescinded or changed by the Commission, judgment shall be rendered upon such original order." Comp. St. § 8591, par. 13.

When the petition as amended first came on for hearing before this court, a large amount of evidence was introduced on the part of the petitioner, which had not been introduced or heard by the Commission before or at the time of the making of its report and order in question. Therefore, in strict conformance with that statutory requirement, this court certified to the Commission the additional evidence that had been introduced by the petitioner before this court for the consideration of and action by the Interstate Commerce Commission, to be by it acted upon within six months from the time of the receipt by the Commission of such additional evidence. Within the six months so designated, to wit, in July, 1925, the Commission returned to the court a report concluding as follows:

"Our consideration of the evidence certified to us by the court leads us to the conclusion that we should make no change or modification in the determination of the value of the property of the San Pedro, Los Angeles & Salt Lake Railroad Company, which we announced in our report and order of June 7, 1923. While our consideration of the evidence submitted to the court leads us to the conclusion just stated with reference thereto, we have given further consideration also to the whole record. It is our conclusion that we should reopen the valuation proceeding before us for the purpose of receiving

further evidence as to the values of water rights and the amount necessary for working capital, as of June 30, 1914."

Subsequently the Commission returned to this court the following supplemental report:

"Interstate Commerce Commission.

"Valuation Docket No. 26.

"San Pedro, Los Angeles & Salt Lake Railroad Company.

"Submitted August 15, 1925.

"Decided October 17, 1925.

"Upon consideration of the evidence introduced at the further hearing, (1) the value of water rights owned and used by the carrier for common carrier purposes determined; (2) the amount of working capital to be included in the final value of carrier's property found to be $1,200,000, instead of $1,000,000, as stated in the original report and order, 75 I. C. C. 462; (3) the final single-sum value for rate-making purposes, of property wholly owned and used by the carrier, found to be $45,200,000 as of June 30, 1914, instead of $45,000,000, as stated in the original report and order, the increase resulting entirely from the increase in working capital.

"Supplemental Report of the Commission.

"By the Commission:

"Our report and order dated June 7, 1923, 75 I. C. C. 462, wherein we reported the final value for rate-making purposes as of June 30, 1914, of the property of the San Pedro, Los Angeles & Salt Lake Railroad Company, hereinafter referred to as the carrier, became the subject of proceedings in the United States District Court in and for the Southern District of California. A petition was filed in that court by the Los Angeles & Salt Lake Railroad Company, that being the present name of the carrier, seeking an order to enjoin, set aside, annul, and suspend the report and order which we had made in this proceeding. The District Court received evidence and certified the same to us for our consideration. Los Angeles & Salt Lake R. R. Co. v. U. S., 4 F.(2d) 736. On July 7, 1925, 97 I. C. C. 737, we made a report to the court in which we said:

" 'Our consideration of the evidence certified to us by the court leads us to the conclusion that we should make no change or modification in the determination of the value of the property of the San Pedro, Los Angeles & Salt Lake Railroad Company which we announced in our report and order of June 7,

1923. While our consideration of the evidence submitted to the court leads us to the conclusion just stated with reference thereto, we have given further consideration also to the whole record. It is our conclusion that we should reopen the valuation proceeding before us for the purpose of receiving further evidence as to the values of water rights and the amount necessary for working capital as of June 30, 1914.'

"Thereafter we entered and served upon the carrier and other interested parties an order reopening this proceeding for further hearing, for the purpose of receiving further evidence relating to the values of water rights and the amount necessary for the carrier's purposes for working capital as of June 30, 1914. Notice of hearing was duly given, and the hearing was held on August 14 and 15, 1925. At the hearing there were received in evidence the testimony and exhibits presented by two witnesses on behalf of our bureau of valuation. One witness testified regarding the carrier's needs for working capital, and the other testified concerning the value of water rights owned and used by the carrier. Both witnesses were cross-examined by counsel for the carrier.

"Water Rights.

"In our original report, at pages 501 to 504, inclusive, we discussed the values of the carrier's water rights. We pointed out that in the tentative valuation prepared prior to any of the hearings in this proceeding no values had been assigned to water rights. We stated that the carrier protested against this omission and submitted testimony intended to show what the values of these rights were as of the date of valuation. We discussed that testimony and the principles which in our opinion were controlling in the determination of the value of water rights, and stated our conclusion as to the values of each of the water rights used by the carrier.

"This finding was attacked by the carrier in its petition to the District Court upon the ground that it was not supported by the evidence in the record. At the further hearing the testimony received was that of a witness who had just previously visited the vicinity of all of the carrier's water rights, and who had gained complete information concerning the nature of those rights, the volume of water consumed by the carrier at wells or springs covered by such rights, and who also ascertained the total quantity of water produced by the springs or wells from which

the carrier derived its water supplies, and learned what other use or uses might be made of the water from such sources, if those were not used by the carrier. While in the vicinity of the water rights the witness ascertained the opinions of many well-informed persons residing and engaged in business there regarding possible uses of the water other than for railroad purposes, and the values of such water for such other purposes.

"In making his appraisal, the witness assumed that it would be proper to state, as the value of each of the carrier's water rights, the value which the water used by the carriers would have for the next highest use to which the water could be put. His method was to ascertain the nature of the source of water; that is, as to whether it was a well or a spring, or any other source. He then ascertained the total daily volume of water issuing from such source and the daily volume consumed by the carrier in connection with its common carrier operations. He next determined whether the water could be used for irrigation of agricultural lands, for the use of live stock, or for any industrial or municipal use. Proceeding upon the assumption that, if not used for carrier purposes, the water would be used for that purpose which would give it its highest value, he secured the opinions of well-informed persons as to the value of the waters for such use.

"In order to illustrate the witness' method, reference may be made to the water right at Kelso, Cal. There are springs at that point about seven miles distant from the carrier's station grounds. The carrier uses the water for supplying its engines. On valuation date it was estimated that the carrier used approximately 72,000 gallons of this water per day. The witness found that, if the water was not used for carrier purposes, it could be used only for the purpose of watering live stock. Five men, whose opinions the witness secured, three of whom were bankers, one a real estate agent, and the other a field agent of the Nevada Agricultural Experiment Station, stated to the witness their opinions of the value of the water for the use of live stock. Based upon such opinions, the witness stated that in his opinion the value of the water right of the carrier at Kelso was $1,000. The record contains an exhibit setting forth the names of each of the men whom the witness consulted regarding the use and the value of water, and notes showing the opinions which they stated to him. The witness was cross-examined at length by counsel for the carrier.

"No useful purpose would be served by a review in detail of this witness' testimony. It impresses us as being the most carefully considered and reasonable evidence in this record concerning the values of the carrier's several water rights. The method of appraisal differed in several respects from the method used by the appraiser who testified as a witness for the carrier at an earlier hearing. The principal differences are that the witness presented by our bureau of valuation based his estimates upon the quantity of water derived from each source which the carrier was using on valuation date, whereas the carrier's appraiser based his appraisal upon the total capacity of each of such sources, irrespective of the amount of water therefrom which the carrier consumed. Moreover, the witness for the bureau, in the absence of records of any sales of similar water rights, based his appraisal mainly upon the best opinions he could secure regarding the values of the water for the several uses stated; whereas the carrier's witness measured the value by what he found would be the increase in the market value of irrigable lands adjacent to the several water rights, as indicated by comparing the probable value of such lands unirrigated with their probable value when brought completely under irrigation.

"Considering all of the evidence in the record in this proceeding relating to the value of the carrier's water rights, we find that on June 30, 1914, the value of the waters and water rights used by the carrier were as follows:

| Location. | Valuation. Section. | Value. |
|---|---|---|
| Kelso, Cal. | 8 | $1,000 |
| Sloan, Nev. | 9 | 1,000 |
| Las Vegas, Nev. | 10 | 3,550 |
| Moapa, Nev. | 10 | 1,125 |
| Big Springs, Nev. | 12 | 1,000 |
| Condor Canyon, Nev. | 13 | 825 |
| Pioche, Nev. | 13 | 4,000 |
| Modena, Utah | 14 | 1,500 |
| Black Rock, Utah | 16 | 4,900 |
| Jericho, Utah | 17 | 2,000 |
| Faust, Utah | 17 | 1,550 |
| Erda, Utah | 17 | 3,050 |
| Juab, Utah | 17 | 650 |

"The testimony shows that the carrier does not own the water right, but uses water, at Pioche, so that its water right at that station should be classified as used, but not owned. The owner is an industrial corporation. At Faust the evidence indicates and we find that the total value of the carrier's water rights on valuation date was $27,350, of which $1,550 is the value of the right to the

carrier, as measured by the extent of the carrier's use of the water for common carrier purposes, and the remainder, amounting to $25,800, is the value of the portion used for noncarrier purposes.

"In our original report we stated, at page 603, that 'the value of the water right at Las Vegas is included in the value we have reported of the carrier's lands to which that right is attached.' This finding did not give adequate recognition to the fact that whereas, the land in question has been classified as noncarrier, the carrier nevertheless uses approximately 25,000 gallons of water per day at Las Vegas for its common carrier purposes. This amount of water would be sufficient to irrigate approximately 54½ acres of land. Upon that basis, and upon the proof that the water for irrigation purposes should be valued at $65 per acre of land that it could irrigate, we find the value of the water used by the carrier at Las Vegas for its common carrier purposes on valuation date was $3,550, as stated in the foregoing table.

"Working Capital.

"In our original order we stated, at page 609, that we included in the single-sum value of property wholly owned and used the amount of $1,000,000 on account of working capital, including materials and supplies. At page 608 we stated that the difference between $1,000,000, considered necessary for working capital purposes, and the total amount of cash on hand and materials and supplies in stock on date of valuation, or $2,221,093, gave a remainder of $1,221,093, which was considered for the purposes of the valuation as noncarrier property. In the petition to the District Court this finding was attacked upon the ground that it was not supported by the evidence in the record. At the further hearing in this proceeding one of our valuation accountants testified in considerable detail regarding the carrier's need for cash and materials and supplies to enable it properly to carry on its common carrier operations. The witness was cross-examined at length by counsel for the carrier.

"It is unnecessary to summarize this testimony further than to say that it indicates clearly that upon the whole this carrier's receipts of cash for common carrier services which it performs reach its treasury in time to meet, as they mature, the expenses incurred by the carrier in performing that service. In view of these circumstances, on valuation date it is evident that this carrier required little, if any, permanent investment in cash

8 F.(2d)—48

for working capital purposes. It undoubtedly did require cash for the purpose of meeting its corporate expenditures, and part of the cash kept on hand was unquestionably used for corporate purposes; but the revenues from operation were collected, upon the whole, in sufficient time to meet operating expenses and taxes as those matured, and to provide a buffer fund to meet any unusual variation from the customary inflow of revenues or outlay for operating expenses.

"The evidence demonstrates that the investment in materials and supplies as recorded in the carrier's books at any time may not be taken as the investment in property of that character necessary to enable the carrier properly to perform its transportation service. Materials and supplies may be carried in stock for purposes of extensions, additions, or betterments. To the extent that they are held for such purposes, the investment in them and the cost of holding them is a charge to capital, rather than to operating expense accounts. The evidence shows, further, that to an appreciable extent the materials and supplies on hand included scrap material, which cannot be used for maintenance or other operating purposes. Property of this kind is disposed of ordinarily by carriers with reasonable dispatch. In any event, to the extent that such material is of a character which has been replaced by new material, it is evident that it is the new material, and not that discarded, which is devoted to common carrier purposes and should be valued as such.

"The determination of the amount necessary for working capital requires, among other considerations, an analysis of the carrier's business, an ascertainment of the time, when it collects and expends moneys in connection with the performance of its transportation service, and an examination of the character of the materials and supplies on hand, besides a study of the extent of the ordinary use of such materials and supplies for capital and operating expense purposes.

"Our consideration of the testimony submitted at the further hearing leads us to the conclusion that the amount of $1,200,000 is a proper amount to include in the final single-sum value of property wholly owned and used by the carrier for working capital purposes. This amount includes the value of materials and supplies, as well as the necessary investment in cash as of the date of valuation. The difference between this amount and $2,221,093, which was the sum of cash on hand plus the book cost of the stock of

materials and supplies in possession of the carrier on valuation date, is $1,021,093, and is considered for the purposes of this valuation as property owned by the carrier, but not used for common carrier purposes.

"Our further consideration of the entire record in this case, including all of the evidence submitted at the recent hearing, convinces us that the value for rate-making purposes of property owned and used by the carrier for common carrier purposes on June 30, 1914, was as stated in our order of June 7, 1923, except that we now find that the amount to be included for working capital should be $1,200,000, instead of $1,000,000, as stated in that order. We are constrained, upon consideration of the entire record as it now stands, to increase the single-sum value of property wholly owned and used by the carrier from $45,000,000 to $45,200,000. This increase results entirely from the increase in the amount for working capital.

"A supplemental order will be entered herein, which will indicate modifications to be made in our order of June 7, 1923, regarding the value and classification of water rights and the amount to be included in the final value as working capital.

"Commissioners Eastman and Woodlock did not participate in the disposition of this case.

### "Order.

"At a general session of the Interstate Commerce Commission, held at its office in Washington, D. C., on the 17th day of October, A. D. 1925.

### "Valuation Docket No. 26.

### "San Pedro, Los Angeles & Salt Lake Railroad Company.

"This case having been duly heard and submitted by the parties, and full investigation of the respective matters and things having been had, and the Commission having, on the date hereof, made and filed a supplemental report containing its conclusions thereon, which report is hereby referred to and made a part hereof:

"It is ordered that the following be, and it is hereby declared to be, a supplemental final valuation of the property of San Pedro, Los Angeles & Salt Lake Railroad Company, as of June 30, 1914:

"*Cost of Lands, Rights of Way, and Terminals at the Time of Their Dedication to Public Use, and Present Value of Same.*— The table appearing under this heading in our order dated June 7, 1923, 75 I. C. C.

463, at page 607, is rescinded, and the following table substituted therefor:

| | Acres. | Present Value. |
|---|---|---|
| Lands owned and used: | | |
| In California | 4,507.60 | $3,784,499.91 |
| In Nevada | 6,762.64 | 107,136.23 |
| In Utah | 12,159.41 | 264,591.22 |
| Total | 23,429.65 | 4,156,227.36 |
| Lands used but not owned, leased from private parties: | | |
| In California | .10 | 38,774.78 |
| Rights in public domain, owned and used: | | |
| In California | ........ | 54,333.94 |
| Rights in private lands, owned and used: | | |
| In California | ........ | 1,000.00 |
| In Nevada | ........ | 7,500.00 |
| In Utah | ........ | 13,650.00 |
| Total | ........ | 22,150.00 |
| Used, but not owned, leased from private parties: | | |
| In Nevada | ........ | 4,000.00 |

"*Property Held for Purposes Other Than Those of a Common Carrier.*—The third paragraph under this heading in our order dated June 7, 1923, appearing on page 608, is rescinded, and the following substituted therefor:

"'The carrier owns and holds cash on hand and material and supplies in the amount of $2,221,093. Of this amount $1,200,000 is necessary for the carrier's use as working capital and is accordingly included in the final value hereinafter stated. The remainder, $1,021,093, which is in excess of the amount required for working capital, is considered for the purposes of valuation as noncarrier property.'

"And the statements appearing under this heading in said order are amended by the addition thereto of the following:

"'The carrier owns a water right at Faust, Utah, a portion of which is held for noncarrier purposes. We find the present value of such noncarrier portion to be $25,800.'

"*Final Value.*—The statements appearing under this heading in our order dated June 7, 1923, at page 609, are rescinded, and the following substituted therefor:

"'After careful consideration of all the facts submitted in this proceeding, including appreciation, depreciation, going concern value, working capital, and all other matters which appear to have a bearing upon the values here reported, the value for rate-making purposes, of the property of the carrier owned and used and used, but not owned, devoted

by the carrier to common carrier purposes, is found to be as follows:

Wholly owned and used..........$45,160,000
Used, but not owned, leased from pri-
    vate parties ...................        40,000
                                  _____
    Total used ..................$45,200,000

" 'The sum of $1,200,000 is included in the value above stated as wholly owned and used on account of working capital, including material and supplies.

" 'No other values or elements of value to which specific sums can now be ascribed are found to exist.'

"And it is further ordered that, except as herein modified, the said order of June 7, 1923, shall remain in full force and effect.
"By the Commission:
"[Seal] George B. McGinty, Secretary."

The case, having been submitted by stipulation of counsel upon the record so made and the briefs on file, is now for disposition.

[1, 2] No one, of course, contends or pretends that this court is charged with the duty, or has any power, to fix the value of the property of the railroad company upon which rates are authorized to be fixed by the Interstate Commerce Commission. With both of those duties the Commission alone is charged; the judicial power only being conferred upon the courts to suspend, enjoin, or annul its action in proper cases.

In the brief of the government, filed in opposition to the jurisdiction of this court over the case, it is said, among other things, as follows:

"Counsel for the petitioner called numerous witnesses, who testified at great length and submitted a large volume of documentary evidence on the subject of this valuation. (The Commission's final valuation as of June 30, 1914.) Certainly the evidence was different from that offered upon the hearing before the Commission and is additional thereto. There can be no question about that. One very important witness, who testified at great length and offered numerous exhibits, stated that he had never been called before the Interstate Commerce Commission by anybody."

Counsel for the government in the same brief further said:

"Judge Robert S. Lovett testified that on June 30, 1914, the company had outstanding a little over $56,000,000, face value, of first mortgage bonds, that had been sold for 90 per cent. of their face. But he further testified that subsequently other bonds were sold, which brought the aggregate to $59,-022,000 out of which the company realized $52,847,000 in cash. Since December, 1917, the company has also borrowed from the Union Pacific interests and owes on open account, up to June 30, 1924, $14,426,000, in addition to the bonded indebtedness.

"On cross-examination, Judge Lovett further testified that the entire capital stock of $25,000,000 of the Los Angeles & Salt Lake Railroad is owned by the Union Pacific Railroad Company and the Oregon Short Line, which in turn is owned by the Union Pacific; that the Union Pacific, Oregon Short Line, Oregon Railroad & Navigation, and Los Angeles & Salt Lake Companies are under a common management and control, and that the stock of all of the other companies is owned by the Union Pacific, either directly or through one of its subsidiaries; that he is the chairman of the board of the Union Pacific, with offices at 120 Broadway, New York. He further testified that early in January, 1924, the stock of the Union Pacific was quoted on the New York Stock Exchange at from $120 to $125 per share, and that, the last quotations he had seen the week before, the stock was quoted at $149 and $150.

"He also stated that the Union Pacific had outstanding over $99,000,000 of preferred 4 per cent. stock and over $222,000,000 of common stock. If the stock of the Union Pacific has steadily enhanced in value to the extent of 25 points per share within the year 1924, or a total increase in value of $55,500,000, it would appear that the credit and financial standing of the Union Pacific, of which the Los Angeles & Salt Lake is but a subsidiary or arm, has not been seriously impaired by this final valuation as of June 30, 1914. Obviously the Los Angeles & Salt Lake has not been torn, as is here claimed by the officers, counsel, and employees of the Union Pacific, or the injury would have been felt by the Union Pacific, which holds, either directly or through the Oregon Short Line, the entire $25,000,000 of the capital stock and $14,426,-000 indebtedness on open account of the Los Angeles & Salt Lake."

The testimony given by the witness Lovett and the other large amount of evidence given before the court, which had not been introduced before the Commission, none of which was in any wise here controverted, this court held, in overruling the objections to its jurisdiction of the case, tended to show that the value of the property of the petitioner used in its transportation business on June 30, 1914, was greatly in excess of that fixed by the Commission. We think it obvious, from

the supplemental report of the Commission, which has been above set out, that it gave no effect to any of that additional evidence given before the court and by it certified to the Commission, as required by the statute. We must therefore decide the case upon the whole record as presented to us.

The additional evidence that was introduced by the petitioner before this court, not only tended to show, but in our opinion conclusively shows, that the value of the railroad company's property, used in its transportation business on June 30, 1914, was greatly in excess of its final valuation fixed by the Commission as of that date, and as fixed in its supplemental report. The reports of the Commission we think clearly show that its action was based upon the view that the property of the railroad company in question has more than one kind of value. And in our opinion that view constituted its fundamental error, and consists in its failure to do what the statute in express and, as we think, clear and unmistakeable terms, authorized and required it to do as the basis upon which to fix the rates to be charged by the railroad company; that is to say, the true actual value of all of the property of the company at the time used in its transportation business.

It is apparent from the supplemental report of the Commission that it attached no importance to the new evidence that was introduced before this court and subsequently certified to it for its consideration, for in its supplemental report, as will have been seen, it expressly states: "Our consideration of the evidence certified to us by the court leads us to the conclusion that we should make no change or modification in the determination of the value of the property of the San Pedro, Los Angeles & Salt Lake Railroad Company which we announced in our report and order of June 7, 1923."

We think the Commission was no more authorized to fix the value of the property at less than its true actual value than it would have been to have fixed it at a greater value. It will be readily seen, from an inspection of the provisions of the Valuation Act, that the Commission is in express terms required to, among other things, "investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions" of the act, and that it in express terms declares that "such investigation shall show the value of the property of every common carrier as a whole and separately the value of its property in each of the several states and territories and the District of Columbia, classified and in detail."

Elaborate provisions are made for the ascertainment of such value, including tentative valuations, notices of which are required to be given and the carrier afforded an opportunity to contest such preliminary valuation or valuations. "If after hearing any protest of such tentative valuation under the provisions of this act," proceeds the statute, "the Commission shall be of the opinion that its valuation should not become final, it shall make such changes as may be necessary, and shall issue an order making such corrected tentative valuation final as of the date thereof. All final valuations by the Commission and the classification thereof shall be published and shall be prima facie evidence of the value of the property in all proceedings under the Act to regulate commerce as of the date of the fixing thereof, and in all judicial proceedings for the enforcement of the act approved February fourth, eighteen hundred and eighty-seven, commonly known as 'the act to regulate commerce,' and the various acts amendatory thereof, and in all judicial proceedings brought to enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission." Comp. St. § 8591, par. 12. And by section 15a, paragraph 4, as added by Act Feb. 28, 1920, § 422 (41 Stat. pp. 488, 489 [Comp. St. Ann. Supp. 1923, § 8583a]), Congress specifically declares that for "rate-making purposes" —the ultimate aim of all of the other statutory provisions herein referred to—the Commission shall give due consideration to all the elements of value *recognized by the law of the land*, and shall give to the property investment account of the carriers only that consideration which under such law (of the land) it is entitled to in establishing values for rate-making purposes—concluding the section with the express declaration that "whenever pursuant to section 19a of this act the value of the railway property of any carrier held for and used in the service of transportation has been finally ascertained, *the value* so ascertained shall be deemed by the Commission to be *the value* thereof" for the purpose of determining the aggregate value of the property of a group of carriers authorized to be created by the Commission.

In no place in any of the statutes bearing upon the question do we find even an implication of any authority on the part of the Commission to find that any of the property of any common carrier used in its transportation business has two kinds of value. It is the true actual value of such property, and that only, as we think, that the statutes in

question authorize and require the Interstate Commerce Commission to ascertain and fix, and that, it is obvious, it has not done.

By the well-established "law of the land" public bodies, charged with the duty of fixing rates to be charged by corporations or individuals for the furnishing of water to the public for irrigation, domestic, or other useful purposes, are required to investigate, ascertain, and determine, as a basis for the rates authorized to be charged therefor, the true actual value of the property used in such business at the time the rates are authorized to be charged. It was so decided by the Circuit Court of the United States for the Southern District of California in the case of San Diego Land & Town Co. v. City of National City, 74 F. 79, and San Diego Land & Town Co. v. Jasper, 110 F. 702, respectively affirmed by the Supreme Court of the United States in 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154, and 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892. That remains a part of the "law of the land."

Congress not only in effect approved and made applicable to the Interstate Commerce Commission that law, by in express terms declaring that the action of the said Interstate Commerce Commission, in ascertaining and fixing the value of the property of the transportation companies as a basis for the fixing of rates to be charged by them should be governed by the *law of the land,* but by further expressly declaring, as has been seen, that the said Commission should fix its value, not for any one particular purpose, but its *value;* that is to say, its *real* value at the time of the fixing of the rates authorized to be charged for such service.

We therefore see no escape from the conclusion and judgment to which we have come, which is that the orders of the Commission, fixing the valuations complained of by the petitioner, be and they are hereby annulled, and the said Interstate Commerce Commission is hereby enjoined from in any wise enforcing them.